The last case on the calendar for argument this morning is Lopez v. Garland. Let me just check while we're waiting. Can you hear us okay, Counsel? Yes, Your Honor. Can you hear me? We can hear you. Great. I hope whatever it is that's kept you from being here is getting better. Thank you. I really appreciate it. Yeah, so far so good. Thank you. Ms. Adams, you may proceed when you're ready. I'm just going to do some adjustment here, Your Honor. Sure, I understand. Thank you. We have women of varying heights this morning. That's true.  I'm always at the lower end of that scale. Actually, we haven't had an argument. Well, we have. Okay, I guess he's not going to. There we are. May it please the Court, my name is Margo Adams with the Northwest Immigrant Rights Project, and I represent the petitioner Eric Benjamin Jaimes Lopez. I'd like to reserve three minutes of my time, if I may, for rebuttal. Thank you. At the heart of this case are Mr. Lopez's undisputed diagnoses of mental illness, and the attendant risk of harm he faces if removed to Mexico, a country he has not returned to since he was brought to this one at the age of five. In denying Mr. Lopez's claims for withholding of removal and protection under the Convention Against Torture, the agency repeatedly mischaracterized that risk, ignoring evidence in the record of intentional physical and sexual abuse and other exploitative harms occurring in Mexican psychiatric facilities. Well, it's a little unfair to say that the agency ignored that evidence. The I.J. discussed it. The I.J. recognized there was evidence in the record of abuse within mental institutions in Mexico. He just didn't find that your client had shown by the requisite level of proof that he would likely or reasonably be subjected to that. So ignoring is a little, I mean, they don't have to ignore it for you to win, but they certainly mention it. Your Honor, I would disagree, I think, with that characterization. The I.J. characterizes the types of harms that are occurring in institutions as a stigma or amounting to, I think, poor mental health care, I'm summarizing there. It doesn't actually account for the fact that things like physical and sexual abuse occur. There is a moment in, I think, with discussion to Catt, where in the footnote of the I.J.'s opinion, he states that finally, towards the end of his opinion, that to the extent that Mr. Lopez is asserting that he'll face torture, you know, as a consequence of this intentional abuse, that he hasn't established the prevalence of that, which I think is belied by the record itself. Well, that's what it seems to me. So the I.J., I mean, and I want to, you know, you make an argument and we ought to listen to it, but I don't think the agency completely ignored the evidence that you proffered. It didn't find it sufficient to establish that your client was entitled to relief. And so my question is, why wasn't it? Why was the agency wrong in looking at all the evidence in this case and determining that your client wasn't entitled to relief? Well, Your Honor, again, I'm not certain that I agree with that characterization. I guess this is a friendly hint. Assume that my characterization is correct. Assume that the agency looked at all the evidence and reached a conclusion you didn't like. Tell me why that conclusion should be overturned. Well, Your Honor, I think that the evidence compels the finding here that the standard that you need here is correct. That's correct, Your Honor. I think there are a number of instances in which the evidence compels the finding that Mr. Lopez would be submitted to future persecution with regard to his withholding claim. For example, I think, Your Honor, that the IJ overlooks the fact that Mr. Lopez's condition is undisputedly worsening. The IJ, for example, indicates that Mr. Lopez is likely to seek community mental health care in outpatient facilities in Mexico. Without any regard whatsoever to Mr. Lopez's testimony that he doesn't know how to seek outpatient health care in this country, let alone in Mexico, again, a country he has not been to since he was five years old, the IJ makes no point to acknowledge the fact that Mr. Lopez's symptoms are worsening. And, in fact, his psychological evaluation clues that he would be at risk of deterioration if removed to Mexico, in part because he wouldn't have a stable support system and he wouldn't be able to seek outpatient services on his own. And, in fact, that deterioration puts him at risk of suicide and self-harm, which are things. If we can distinguish the danger while he is in the community from if he is institutionalized, would the claim here basically be that anyone who is or may be institutionalized in a mental hospital in Mexico, entitled to at least withholding and perhaps to cat relief? That is, how is he different from someone else who has problems that might lead to institutionalization? Well, Your Honor, this is a basis for withholding on Mr. Lopez's membership in a particular social group. And to that end, of course, he extended three particular social groups that he belongs to. And, again, in the agency- The degree of persecution is the fact of institutionalization or what happens after you're institutionalized? Well, as the evidence indicates, Your Honor, including evidence that our own Department of State indicated, abuses in psychiatric facilities in Mexico are rampant. And those include intentional- But then you would be saying that anyone who is likely to be institutionalized would be entitled to cat protection? Well, I think both withholding and cat, although there are other claims with regard to cat and persecution. Let's go back to your social groups because it's the same- I think I want to ask the same question Judge Boggs is asking in a different way. You've proposed three social groups. Are you urging all three on appeal? Yes, Your Honor. Okay. So tell me why any individual who had perceptible mental disease, presuming that your client falls into that group, wouldn't then automatically be entitled to cat relief if removed to Mexico under your theory of the case? Well, Your Honor, Mr. Lopez put forward a couple of theories. One is that the lack of outpatient health care in Mexico means that he'd be forced to seek treatment at a psychiatric facility. No, I understand. Why is Mr. Lopez different than any other individual with perceptible signs of mental disease? In other words, he's not- Your claim is that he faces persecution or torture solely because of that, right? Not because of anything else about him. If I'm understanding your question, Your Honor, you're asking his membership in the group defined by- No, let's assume he's a member. Let's assume these are recognizable social groups and that he's a member of the group. Lots of people, it seems to me, would be members of this group. Judge Boggs asked the question, and I'm trying to rephrase it to see if I can satisfy myself with the answer. Are you saying that anybody who is a member of one of these social groups would be entitled to cat relief or withholding or asylum? Well, not asylum in this case. Assuming that all the elements of those claims are further met, but I- Yeah, but what other evidence would be needed is, I guess, my question. You're basically making a per se claim, are you not? You're not saying there's something about him. The authorities are after him. In the past, he's been subjected to torture. So you're saying everybody who's in these groups would qualify for, if they weren't disqualified because of a conviction, withholding or asylum or cat relief. I think, Your Honor, you're getting to, I think, whether the groups are defined with particularity or socially distinct. Well, I am, but I'm asking a very particular question. And so my question is, aren't you contending that every Mexican who fits in these groups is entitled to at least withholding or cat relief? I think so, Your Honor. If they meet the other requirements of those- But the other requirements are not particular to those individuals. In other words, it's just membership in these groups that would entitle them to cat relief, right? Yes, if I understand your question correctly, the application for cat is based on persecution as a member of either of Mr. Lopez's particular social groups. And your position is anybody who has these characteristics is more probable than not to be tortured in Mexico. More likely than not, Your Honor, or be subjected to persecution. More likely than not. And when I was- And therefore, every person with, every Mexican alien with perceptible mental disease is entitled to cat relief. I'm doing the ergo sum part of it. Yes, and when I said if they meet the other requirements, I mean, of course, every case is based on an individualized assessment of the record. But the record in this case that you make your torture or persecution claims on is a country conditions record. There's nothing else in it other than the country conditions reports, right? The country conditions reports also, but in the context of Mr. Lopez's individualized manifestation of his illness. So, for example- That simply means that either he has PSTD, he has neurocognitive, or he has mental health disorders, right? Those are the three conditions. When you say the other things he has to prove, he would have to prove the things that get him into that group. That's correct, Your Honor. And not just that, though, but, you know, his psychological evaluation, which I mentioned, indicate that his condition will deteriorate, putting him at risk of suicide and self-harm, which are symptoms that are more, I should say, salient. Is one of your proposed social groups somebody whose condition will deteriorate? I thought the group you proposed- No, Your Honor. I'm speaking more to the risk itself, to the more than likely than not burden if Mr. Lopez is removed. I think that- So now I want to get back. So let's assume that we have somebody who doesn't have evidence that his condition will deteriorate over time. As I read your argument, it would be he would nonetheless be entitled to relief because, you know, he's in the social group, and people in the social group get put into institutions in Mexico. Or is your argument that your client is more likely to be put in an institution than others? As a member of the particular socialized group, in the context of these country conditions evidence, which also include the fact that people who suffer from mental illness in Mexico are more likely to be detained by police, where torture at their hands is so general. Can I ask you a question? Does your- you continue to say deterioration, and I'm wondering if that is a concession, that his current situation in the U.S., in which he never sought treatment, he was never hospitalized, he was never institutionalized. Your argument basically requires him to have a deteriorated mental state or physical condition. It just requires a lot of multiple speculative steps, right? He has to deteriorate, he has to become homeless, or he has to get into an altercation in Mexico, the police have to arrest him, then he has to go into a prison where then he will be persecuted or tortured. It just requires so many steps. So I guess my question is, why, if it requires that many speculative steps, would it be more likely than not that he would be tortured or persecuted? Well, Your Honor, I don't think that it's a concession. I think it speaks to the burden, right, that you're speaking of, that it's more likely than not that he will be subject to persecution or torture if removed. That's just one piece of evidence in support of that claim. But you're requiring deterioration of his current mental health, correct? I'm not necessarily requiring that, Your Honor. I think that he already exhibits perceptible signs of his mental illness here in this country that have already brought him to the attention of police, contrary to what the agency concluded here. The only cases that you included in which the BIA said there was a legally cognizable social group based on mental illness were actually mental disability cases, correct, such as the intellectual disability that was at issue in Acevedo Granados. You don't have any that have this type of social group definition, perceptible mental health disorders. Yes, or Mexican males who suffer from post-traumatic stress disorder and neurocognitive disorder. I think that – Would you concede that perceptible is subjective? It's not subjective, I think, to psychologists, which provides a clear benchmark from which professional psychologists can determine who falls within the group, which is, of course, the touchstone of – Wait, you're saying there's a specific diagnosis of perceptible? No, Your Honor. I don't think that with regard to the burden, I was citing Acevedo Granados there. I don't think it is as clean there with regard to Mr. Lopez's proposed particular social group, perceptible mental illness. But I do think that it informs the fact that the definition of the group is not so overbroad that he cannot be identified by professional psychologists, thereby providing a clear benchmark of who – But the IJ in this case, who, by the way, does list the country condition reports, he has a long list of evidence, he says he's considered, looked at, and if I don't mention it later, it doesn't mean I've ignored it. But the IJ in this case says, I don't think your client can demonstrate that he's a member of the group that has perceptible. That's right. Because no one knows but his mother. Nobody else. He says, I keep this carefully from everybody else. I only really suffer from it at night, and therefore others really don't know. So under those circumstances, why was the IJ without support in the record for finding that your client wasn't a member of that group? Because the record indicates other instances in which – Well, there's evidence both ways. As Judge Boggs indicated, the record has to compel the conclusion. And while there was some evidence, whether or not what he did to the security guard was evidence of mental illness or just something else is open to debate, but you're certainly entitled to argue it. On the other hand, there's evidence that he says, I conceal it from people and only my mother really knows. So given the fact that there's evidence on both sides, why does the record compel the conclusion that he's a member of that group? Well, the agency doesn't indicate that there's evidence on both sides. The agency – or the IJ, I should say, states unequivocally that he does not exhibit perceptible signs of his mental illness. But that is simply not true on a basis of the record. The agency itself identified Mr. Lopez at his competency hearing as having a, quote, cognitive defect. And the IJ who presided over that hearing did so on the basis only of medical records that made no indication that Mr. Lopez – We're talking about perceptible. That's right, Your Honor. But I'm not speaking to whether the relevance of his competency to represent himself or not. I'm talking about the fact that the IJ perceived Mr. Lopez to have a cognitive defect through simply a colloquy and open court. Because he ordered a competency hearing. He ordered a competency hearing because Mr. Lopez asked for. At that competency hearing, the IJ based solely on his colloquy and medical records that didn't mention mental illness perceived that Mr. Lopez had a, quote, cognitive defect. That speaks to the fact that his illness is perceptible and also the fact that Mr. Lopez said that he was in special education classes. And then, of course, the fact that the conduct that led to his conviction resulted from symptomatology of his PTSD. So it's simply not accurate for the agency to conclude that Mr. Lopez does not exhibit perceptible signs. But aren't you asking what Acevedo Granado says we're not supposed to do? We're not supposed to have the IJ make these subjective determinations at watching a petitioner at the hearing? And that's what you're saying would be required, right? Because there's not going to be a licensed diagnosis by a psychological professional on perceptible. Right, Your Honor. I don't think that I'm saying that I'm asking the IJ to do that in the moment. And I agree that Acevedo Granado says that that's not the job of IJs. What I'm saying is that particular interaction with the immigration judge is just yet another example of the fact that Mr. Lopez's mental illness is, in fact, perceptible. That evidence is in the record. And the IJ in this instance failed to acknowledge that that is yet another example of how he indicates perceptibility of his mental illness. Yes, I'm aware of my time. We'll give you a little bit of time. Thank you. I appreciate it, Your Honor. Ms. Carlson, whenever you're ready. Good morning, Your Honors. May it please the Court. My name is Jessie Carlson. I represent the government in this case. I would like to start by addressing some of the petitioner's arguments kind of put on, first and foremost, the notion that the IJ ignored the evidence in the record regarding both the country conditions and the mental health diagnosis. That's simply not the case, as Your Honors probably saw the IJ's decision was very comprehensive in this case and really seemed to touch on all of these points comprehensively. And the bottom line is that petitioner simply does not meet the heightened burden that is relevant for and required for withholding and cap protection. So, I mean, this is not a matter of IJ ignoring the evidence. The IJ thoroughly assessed the evidence. The other thing I'd like to point out is that the IJ did not also overlook the fact that, you know, any conclusion that this condition is, in fact, worsening. If you look at the mental health expert's report on this, it makes very clear that, number one, there is a PTSD diagnosis, but, number two, the cognitive disorder is addressed as mild. Right in the diagnosis, it's characterized as a mild disorder, and there is a suggestion that with appropriate, you know, even as far as, you know, better eating and health habits, medication, you know, these symptoms can improve, which I think went to the IJ's conclusion as far as perceptibility is concerned that, unlike many of the conditions that are set forth both in the country conditions report and in the supporting case law, the petitioner cites, which involve conditions that are very apparent to society. They're very apparent in the sense that they require additional and more, you know, they're more severe in nature, and so the care that's required is more, you know. I wanted to ask you a question about the record, and I'm not sure I'm right about this. Is the contention of either future persecution, because there's no contention of past persecution or torture in this case, is the contention of future mistreatment all premised on the notion that he will be institutionalized? Is there any other evidence in this record that the government either does or individuals with the acquiescence of the government persecute or torture mentally ill individuals other than in these institutions where apparently there are bad conditions? Well, your honor, I think petitioner has mentioned the fact that an individual might come to the attention of law enforcement because of certain conditions. I don't recall specifically. But coming to the attention of law enforcement is not persecution or torture. Correct. May I ask a question inartfully? Is the entire torture or persecution claim based on the notion that once having been perceived by law enforcement or others as having mental disease, that institutionalization would follow and that's where the persecution or torture would take place? Yes. Or is there a separate? I just couldn't find it, and I'll ask counsel this, too. I couldn't find any other evidence in the record that said, well, those with other than being put in institutions where they're mistreated? I think, you know, again, I don't recall anything specific. I think the kind of the conclusion of any of these allegations is that they would land in one of these institutions, you know, regardless of whether they are become homeless. I ask this because I wanted to get back to Judge Koh's question before. The IJ seems to say, gee, it's speculative whether or not you would be institutionalized, which seems to be the critical key here because that's where the persecution or torture would allegedly take place. What's the basis in the record for the IJ saying it's speculative that you would be institutionalized? Maybe there's no evidence on the other side to show that it's likely that he would be. But how can we tell from this record what likelihood there would? The likelihood of institution, yeah. I think, well, I think the record, the country reports, there's several kind of different reports. Some of the country reports are, in fact, dated, too. They go back, you know, several years. So I think there are some more recent, but there are also some that are dated that document different kinds of abuses. And oftentimes the country reports talk about disabilities kind of in a general manner. In some of the examples I saw, certainly there are a host of mental health disabilities that are included and addressed. But there are others that they talk about people with several palsy, other kinds of disabilities. So I think the IJ was looking at the kind of breadth of the reports and some of the allegations and then looking at the condition that petitioner, the conditions that petitioner has been diagnosed with and kind of assessing, you know, based on the perceptibility and the severity of the symptoms that, you know, are purportedly manifesting, you know, whether, you know, kind of where on the spectrum those things fall and the likelihood, you know, that he will, in fact, the petitioner would, in fact, be identified and then ultimately end up in one of these situations where some of these, you know, allegations have been made of mistreatment and other potential harm. So I think when you look at the entire record and look at, you know, his condition versus the other conditions that have been identified, I think that is where the more likely than not that petitioner does not meet the burden that would, that he is likely to be one of these individuals. More likely, he would be more likely to be an individual seeking medication or outpatient services, even, you know, presumably in kind of, I don't want to say the worst case because obviously anything can change with somebody's mental health condition and I'm not a medical professional. But based on these diagnoses, you know, the treatment doesn't appear to call for any kind of inpatient treatment. The medical report, the medical experts' recommendations do not call for any kind of inpatient, you know, institutionalization or anything like that from what I recall. So I think the IJ was looking at all of that. Another point I'd like to raise is with regard to the competency determination made by, and that was not made by the IJ who actually provided this particular decision, but a prior IJ handled the competency hearing. And in that hearing, I want to point out that petitioner asked for the competency hearing. It was not something that the IJ, you know, met him or identified him and said, you should have a competency hearing. It was something that was requested and, of course, was then provided. And then the determination was made, you know, to provide.  You're not challenging the determination? No, no, no. Nobody's, no, that's not being challenged. I just want to point out kind of how it came to be because petitioner's counsel was suggesting that, you know, that meant that the conditions were perceptible. But if you look at the record, and the IJ obviously would have looked, the IJ making the, you know, final conclusions looked at the record and saw that that is a very different determination than whether or not, you know, petitioner meets his burden with regard to the mental health diagnosis because he was, the consideration, the PTSD, any of the mental health. I don't even know if the mental health report had been conducted at that point. So the determination seemed to be made based on the educational needs of petitioner. And the fact that, sorry, your honor, go ahead. Okay. If we could move on to the other two social groups, do you concede that the second and third social groups are particular because PTSD and neurocognitive disorders can be diagnosed by a licensed professional? Your honor, I would not say that we would make that concession. I think that they were, you know, the determinations on those were made, you know, in footnote, I think it's footnote six on page 19 of our brief, you know, where it was discussed that they really, you know, there was really no need to specifically address those because there are other independent bases. But I think with regard to both of those groups, they suffered the same flaws that the initial group, which was the perceptibility, sorry, I don't have the specific, the Mexican males with perceptible mental health disorders. What do you think are the reasons those two groups are not particular? Well, your honor, they are, you know, again, they are certainly broad groups. And with regard to the second group, the neurocognitive disorder, that group, you know, again, in this case, the petitioner was diagnosed with a mild cognitive condition. And these are very broad groups that can encompass individuals with multiple symptoms. These are not unlike many of the instances where this court and the board has determined that a particular social group is cognizable where there are specific characteristics that are identified, specific symptoms. So the problem, counsel, is the problem of the breadth or the recognizability because it needs to be recognized generally socially in the society. Right. I think it's both. It's a bigger problem to say that that is visible rather than that it's too broad. I mean, there are many groups that are very broad, but everybody knows that particular race or gender. Correct. I think that it suffers on both fronts. Well, but stop pushing both fronts because Judge Box has asked you a particular question. The group of people with PTSD may not be very broad. There may be a limited number of people with PTSD. So I have difficulty with the breadth argument. But what the IJ seemed to be saying is it wasn't viewed as a socially distinct group within Mexican society, probably because you couldn't tell which people had PTSD. Yes, Your Honor, that's what I was going to get to is the fact that it is not the symptoms are not. Now, I just want to step back for a second because obviously there are many mental health disorders where symptoms would not necessarily be visible and the IJ acknowledged that here. However, for the society to be distinct in society, there has to be some kind of defined characteristic that would set this group apart. And often somebody with that disorder, as in this case, petitioner's mother didn't even know that he was suffering from these issues. It was not apparent to anybody. It was something that he was dealing with. In this case, his symptoms he indicated mostly were at night in his dreams. It wasn't something that he was manifesting outwardly on a day-to-day basis that was perceived by society as being distinct. And I think often the record seems to reflect that based on the mental health evaluation, that can be the case with this kind of diagnosis. And then with regard to the cognitive, the mild cognitive issue, it's a similar situation where being characterized as mild, he's able to go about his, at least from the record, appears to have been able to go about his life, attend school kind of without anybody knowing and anybody recognizing that he had these issues, aside from perhaps some of the special education issues that were noted in the record. Can I take you back to a question Judge Koh asked before? We've said you shouldn't base your determination on observations in the courtroom about whether somebody has a disability. Didn't a judge do that here? Are you talking about the judge with regard to the competency or the ultimate? No, not the competency. I'm talking now about, I mean, the judge does seem to say, well, it does say, AR-91, Lopez does not exhibit perceptible signs of mental illness. Now, we've said in the past you shouldn't make a determination of intellectual disability simply by looking at somebody in the courtroom. Why wasn't that error? Well, I think in this case, you know, assuming that, let's just assume that it was error. If it was, it would seem to be a harmless error in the situation because he took, the judge took a comprehensive look at everything in the record. But, you know, I think it's, I think the determination, again, was made in conjunction with the record and with all of the facts. I'm not sure it was error. I wasn't asking you to concede it. I'm just asking. Yeah, no, I'm not conceding that it's error. I'm just saying, even assuming if it was, I'm definitely not conceding that it was. But I think that, you know, one of the, as an IJ, one of the things an IJ does is, you know, and it may not relate specifically to the perceptibility of the mental health symptoms, but, I mean, there is certainly an observation of credibility and kind of, you know, the ability to, you know, conduct oneself in that situation. I know that's not what you're asking about, but I don't think that that was kind of what the IJ was hanging all of the determinations on. The record was very clear that this is something that has not been recognizable or apparent. These conditions were not apparent throughout this individual's life, and it's not something that seems to be apparent even at this point. Can you address the two cases that the petitioner attached as an appendix to their opening brief that, you know, BIA found that mental disabilities were a legally cognizable social group? Yeah, I believe I'd have to look at them specifically, but from what I recall kind of collectively is that in those instances, again, they were talking about mental health disorders that were far more severe in nature and where symptoms were identified in the particular social group definition to be far more specific and addressed. I think one of them might have addressed erratic behavior, and so I think that there's a distinction there because they certainly were far more well-defined and definitely dealing with different. How is erratic behavior? That's not a DSM diagnosis, is it? Erratic behavior actually sounds. It was in conjunction with an actual. I think it was in conjunction with a diagnosed, an actual condition. So I think it was the condition was probably articulated, if I remember correctly, and then it was, you know, in conjunction with some other symptoms and behavior to make it a far more kind of narrow group than what, you know, the breadth of the groups that we have here, which are very, you know, very large in nature and all encompassing. And as pointed out by the support earlier, you know, really would create a very, very broad group of individuals who would be, you know, eligible for these types of relief and protection. I think you've exceeded your time in this, Judge Boggs, Judge Koh. Thank you. Thank you, Your Honor. We'll put a couple minutes up for you. Thank you, Your Honor. I just want to first address your question, Judge Hurwitz, about whether there was any other evidence speaking to persecution or torture in the record besides the possibility of institutionalization. And, in fact, there was, and that was evidence of torture in police custody. So the evidence indicates that people who suffer from mental illness are more likely to have a higher risk of being detained by police, which is something that the agency acknowledged. What the agency did not acknowledge is the type of harm that they would be subjected to if in police custody. So that gets me back to the question I was trying to ask before, and I think this is helpful. For your client to win, we have to conclude under the withholding standard that there's a probability that he would be persecuted, or under the CAT standard that it's more likely than not. That's right. So what we would have to conclude on this record is that it is more likely than not or probable that your client would be either taken into police custody or put in a mental institution. And then, if so, the bad treatment would follow. Well, with regard to the CAT claim, Your Honor, in fact, the IJ didn't acknowledge the evidence. Just saying, to win. Yes. That's correct, Your Honor. Let's put aside any procedural errors. That is the burden that Mr. Lopez has here to show that it was more likely than not. With regard to the CAT claim in particular, this Court has held, and of course the statute and the regulations require that the IJ assess all evidence of possible future torture before it. The IJ here characterizes any kind of harm that, or mischaracters any kind of harm that Mr. Lopez might face in police custody as, quote, lawful sanctions for criminal activity and ubiquitous poor prison conditions, blatantly leaving out or ignoring evidence of, quote, systemic use of torture by federal, state, and municipal police that this country's own Department of State has documented and that the record was replete with. There's simply no analysis in the IJ's decision that acknowledges that source of torture. So to the extent that the agency was skeptical of Mr. Lopez's claim that he will face torture as a consequence of being placed in a psychiatric institution. But that source, what you call that source of torture, does require not that it happens sometimes to some people, but that it's likely that it would happen to him. Yes, but. But for example, if people who commit crimes in Mexico are thrown in prison and frequently bad things happen to people in prison, doesn't mean that everyone who is going to commit a crime, if it's sent back to Mexico. That's right. That's right, Your Honor. Is likely to face torture. That's right, Your Honor. But the record also indicated here, as I had mentioned, that there's often police interaction with folks who suffer from mental illness, that a lot of times they come to the attention of police, either because of their symptomatology or the fact that they're homeless. That's also true for people who are criminals. That's true, Your Honor. But with regard to Kat, Mr. Lopez doesn't need to show that he would suffer harm. There is no nexus with regard to his mental illness and the possibility of future torture. That's only true for his withholding claim, which is something that the agency sort of implicitly imposed here. You know, the agency acknowledged that there was a future risk. I'm sorry. The agency acknowledged that mental, those who suffer from mental illness face a higher risk of detention, but then stated it wasn't persuaded that police specifically target individuals with mental illness for arrest and so that he is not, Mr. Lopez has not therefore established that police will target him for arrest or detention for reasons related to his mental illness. That's a nexus requirement that simply is not required here for Kat. Can we go back to Judge Hurwitz's question? It does seem as if your argument completely depends on Mr. Lopez being institutionalized either at a psychiatric institution or in prison. Is that not correct? If by institutionalized you mean not in the medical sense, but also detained by police custody? Well, that's my sense of your argument that his sources of torture or persecution will be inside a psychiatric facility or inside police detention. That's right. Inside police detention, whether it be, and there's evidence in the record indicating that torture starts the moment that a person is detained. I guess, give us your best evidence as to why Mr. Lopez, who has not received mental treatment and has not been institutionalized, hospitalized in the U.S., would end up being a resident of a psychiatric facility or detained in police custody. Your Honor, that goes to my earlier point about Mr. Lopez deterioration, which I think is obviously salient here, right? The fact that his illnesses have manifested themselves in this country is not going to give us an answer to the question as to how they would manifest themselves if he is removed to Mexico, right? And the psychological evaluation of Mr. Lopez's testimony give us indications there. I'm sorry to interrupt you, but does your argument then depend on deterioration? No, Your Honor. I think that because Mr. Lopez already exhibits perceptible signs of his mental illness, that he will face persecution on account of that regardless. But I think that deterioration speaks to the burden here, the more likely than not burden. That is evidence that the department did not contest below, that his symptoms are expected to worsen. But let's assume deterioration. What evidence in the record is, is there that it is more likely than not that mentally ill individuals with whatever characteristics you want to attribute to Mr. Lopez will be arrested or institutionalized in Mexico? I know they occasionally are. But is there any evidence in the record that it is more likely than not that they will be institutionalized or arrested? Well, it says here that more than an estimated 40% of people in the Mexican criminal justice system have mental disabilities. Right, but that doesn't mean they were arrested for that reason. No, it does not mean that they were arrested for that reason. But it does mean that. And that's less than 50%. Well, that goes, yes. But again, this court has to take into account, I should say the IJ had to take into account all sources of torture and aggregate the risk. So to the extent that it's only 40% likely that Mr. Lopez. Well, I'm just trying to figure out how, from what let's assume you were saying to the IJ aggregate the risk. So tell me where in the record there was evidence from which the IJ could measure those risks to aggregate them. Sure. There's some evidence that, that police may arrest mentally ill individuals and mistreat them afterwards. There is evidence. There's no evidence of how often that occurs or how often they're mistreated. There's some evidence that mentally ill individuals are sometimes placed in institutions in Mexico, but there's no evidence of what, how often that occurs or how often they're mistreated once they are. And so I'm trying to figure out how it is that you meet your, your burden of proof standards on that evidence. Sure. Your Honor, it's an individualized risk specific to Mr. Lopez taking into account the fact that he already exhibits perceptible signs of his mental disorders. The fact that he's expected to do much worse if he is deported to Mexico, the fact that Mexico has no robust outpatient clinical mental health supports, all of those things suggest that he is likely to need to seek help as he deteriorates from a psychiatric institution or exhibit signs of mental illness that will bring him to the attention of police, whether the police then torture him or persecute him as the case may be while he is in their custody or on the way to a psychiatric institution where he will face intentional forms of physical and sexual abuse. Those things amount to a more likely than not possibility that Mr. Lopez will be tortured. Can I ask one? Sure. The part you were quoting, if I heard it correctly, it said 40% of people in prisons have perceptible mental disabilities. Was that about what it was? Your Honor, I, in my notes here, it said AR 406. I want to make sure that I get it correct. It says I wrote to myself an estimated 40% of the Mexican criminal justice system with, have mental disabilities, but I'm not sure if that's half the population. That's close enough. But my point is the fact that 40% of people in prison have mental disabilities doesn't say that 40% of people with mental disabilities go to prison. Sure. Because we know that the number of people in prison is probably a lot less than the total number of people who commit crimes. So that simply doesn't go to the point of how likely it is, you know, that a person with mental disabilities will end up in prison. Again, you know, I'm just a lawyer, so I try to avoid math, Your Honor, and statistics. That's a question I hear a lot, but it doesn't sell. Okay. Whether or not that statistic is correct, I think it speaks to the heightened risk to people who suffer from mental illness in Mexico. Can I ask one last question? You have an argument in your briefs about gang violence. Is that at all tied specifically to Mr. Lopez or his social groups, or is that just general gang violence in Mexico? It's specific to his cat claim, Your Honor. Obviously, widespread gang violence is one of the things that Mr. Lopez asserted he fears torture upon. And so I think it just speaks to the aggregate risk of torture, that that too needs to be taken into account. How does that tie to his proposed social groups? It does not, Your Honor. I think that was just asserted specifically with regard to his individualized list for torture and his cat claim. No, we don't have further questions. I thank counsel for their pro bono efforts in this case. I thank both counsel for their briefing and argument. This case will be submitted and we will be adjourned for the day. Thank you, Your Honor. All rise. This court for this session stands adjourned.
judges: Boggs, HURWITZ, KOH